```
               IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES                  :     CRIMINAL ACTION
                               :     NO. 07-177
          v.                   :
                               :
TERRANCE MANUEL                :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                             SEPTEMBER 7, 2007

    Defendant Terrance Manuel has moved to suppress physical evidence and statements (doc. no. 19).  The Government responded to the motion (doc. no. 22) and, at the Court's request, filed a supplemental response to address Pennsylvania state cases on point (doc. no. 37).[1]

    The Court held a suppression hearing on July 18, 2007, and for the reasons that follow will deny the motion.  This Memorandum constitutes the Court's findings of fact and conclusions of law.

I.  BACKGROUND

    Following a Pennsylvania state prison term for a narcotics offense, Manuel was released on parole in September 2004, under the supervision of the Montgomery County Adult Probation

---

[1] Defendant wrote a pro se letter to the Court on August 13, 2007, responding to the Government's supplemental response.

Department, specifically Officer Kim Seidel.  Around April 2005, Officer Samuel Dowling assumed responsibility for Manuel's supervision.  In December 2005, the date Manuel's prison sentence was set to terminate, Manuel became a probationer.  He continued to be under the supervision of Officer Dowling.

When Manuel was released on parole, he initialed a Montgomery County Adult Probation and Parole Department form entitled "Rules and Conditions Governing Probation/Parole and Intermediate Punishment (IP)."  The form provides in relevant part:

> 1. I will abide by all local, state, and federal criminal laws. . . . I will abide by the rules and conditions imposed by the Montgomery County Adult Probation and Parole Department. . . .
>
> 3. My officer will make supervision visits to my home. Prior to changing my residence, I must have the permission of my probation/parole officer.
>
> . . . .
>
> 10. I understand that Adult Probation and Parole Department has the authority to search my person, place of residence or vehicle without a warrant, if he or she has reasonable suspicion.

At the time, Manuel provided the Probation Department with his approved address: 730 George Street, Norristown, Pennsylvania.  Manuel lived with his mother at this address.

On January 20, 2006, Dowling received an anonymous tip that Manuel was selling drugs and was residing at unapproved residence, 916 W. Washington Street, Apartment B, Norristown,

Pennsylvania.  According to Dowling's testimony, he did not know the identity of the informant or why the informant contacted him (Dowling), of all the Montgomery County probation officers.  The same day he received the tip (January 20), Dowling and another officer went to 916 W. Washington.  There he saw "T. Manuel" on the mailbox outside the front door.  Dowling made a notation of the tip and seeing "T. Manuel" on the mailbox in Manuel's file, but took no further action.  Sometime a few weeks later, Dowling received another tip (from the same informant) on his office phone's voicemail, also stating that Manuel was living at the unapproved residence.  Dowling did not make a notation of this message in the official file.

On February 24, 2006, Dowling arranged to meet Manuel at a laundromat in Norristown later in the day.  Dowling and three other other probation officers went to the laundromat, saw Manuel, brought him outside, and handcuffed him.  Dowling then told Manuel that the probation officers were now going to go to Manuel's house.  Manuel assented.  Then Dowling specified that he was referring to the house on W. Washington Street (the <u>unapproved</u> residence) and, according to Dowling, Manuel's eyes "got big."  7/18/07 Trans. at 12, 39.  Dowling then put his hands in Manuel's pocket, retrieving a set of keys.

The probation officers then drove to 916 W. Washington Street with Manuel handcuffed in the back of the car.  Dowling

used Manuel's keys to unlock the door to the building and to apartment B. Once inside the apartment, Dowling testified that he smelled marijuana. He then searched the apartment, finding a gun in a dresser and narcotics in the dresser and in a box on the floor. Dowling then called the Norristown Police Department, which obtained a search warrant from a Pennsylvania magisterial district justice and proceeded to thoroughly search the apartment by hand and with a K-9 dog.

After the search, Defendant made statements to Dowling regarding the ownership of certain woman's and baby's clothes found in the apartment and the whereabouts of the woman and baby.[2]

Manuel was charged in a four-count indictment with possession with intent to distribute 5 grams or more of cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1); possession with intent to distribute cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1); using and carrying a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

Manuel has moved to suppress the gun and narcotics as fruits of an unconstitutional search. The Government opposes the

---

[2] The text of the exact statements was not provided to the Court.

motion, asserting that the search was constitutional.[3]  Manuel has also moved to suppress the statements regarding the ownership of the woman's and child's clothing, and the whereabouts of the woman and child, but the Government has agreed not to use those statements in its case-in-chief (it reserved the right to use the statements to impeach Manuel, should he testify at trial).

II.  DISCUSSION

This case hinges on whether Dowling had a "reasonable suspicion" that Manuel was in violation of the terms of his probation[4] such to search the residence at 916 W. Washington Street.

---

[3] The Government did not oppose Manuel's motion to suppress on the basis that Manuel lacks standing under the Fourth Amendment.  Theoretically, Manuel's position appears to be internally contradictory: although the residence was not his, he enjoys a reasonable expectation of privacy in it such to contest the search.

[4] The Government initially represented to the Court that Manuel was a parolee at the time of his arrest, but it turns out that Manuel was actually a probationer.  While a few years ago this distinction was of little import, because the Third Circuit long considered probationers and parolees in identical stead for Fourth Amendment purposes, see United States v. Williams, 417 F.3d 373, 376 n.1 (3d Cir. 2005), the Supreme Court has recently counseled that probationers have a higher expectation of privacy under the Fourth Amendment than do parolees, see Samson v. California, 126 S. Ct. 2193, 2198 (2006) ("[P]arolees have fewer expectations of privacy than probationers . . . .").  Thus, the Supreme Court concluded that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee."  Id. at 2202.  The Fourth Amendment likely prohibits a suspicionless search of a probationer.  See Griffin v. Wisconsin, 483 U.S. 868, 873 (1987).

The traditional Fourth Amendment standard, probable cause, is based on a well-known balancing test:

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests.

United States v. Knights, 534 U.S. 112, 118-19 (2001).  However, when the Fourth Amendment rights of the individual who is at issue is a probationer, both sides of the traditional balance are affected: the probationer has a reduced expectation of privacy and the government has a heightened need to monitor behavior.  Id. at 119; United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005).  Thus, a probation officer needs only "reasonable suspicion" of criminal activity--not probable cause--to conduct a search of a probationer.  See Knights, 534 U.S. at 121 ("The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable.").[5]

---

[5] While Knights focused on a probation officer's search for criminal activity, here the probation officer conducted a search for a possible probation violation.  However, the Third Circuit has clearly held, relying on Knights, that "such inquiries into the purpose underlying a probationary search are themselves impermissible."  Williams, 417 F.3d at 377.  In other words, for Fourth Amendment purposes, it is immaterial whether the probation officer had a reasonable suspicion of criminal wrongdoing or of a probation violation.

Normally, the Court examines the facts of the case to determine whether the officer had "reasonable suspicion" for the search before examining whether the officer had some other legitimate basis--such as a consent--for the search. United States v. Baker, 221 F.3d 438, 445 (2000).  Here, however, the Court need not separately examine whether Pennsylvania's statute or Manuel's signing of the probation form provide an alternate legitimate basis for Dowling's conducting the search, because both sources contain the same "reasonable suspicion" standard as articulated by the Supreme Court in Knights.  See 61 Pa. Cons. Stat. § 331.27b(d)(2) (permitting a probation officer to conduct a search of a probationer's property if "there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision"); Montgomery County Adult Probation & Parole Dep't, Rules and Conditions Governing Probation/Parole and Intermediate Punishment (showing that Manuel initialed the form acknowledging "that Adult Probation and Parole Department has the authority to search my person, place of residence or vehicle without a warrant, if he or she has reasonable suspicion").  Therefore, the Court need only examine whether Dowling had "reasonable suspicion."

"To decide whether 'reasonable suspicion' exists, [the

Court] consider[s] the totality of the circumstances to determine whether the 'officer has a particularized and objective basis for suspecting legal wrongdoing.'" Williams, 417 F.3d at 376 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

Here, one of the Probation Department's conditions is that a probationer provide the address of his residence to the Probation Department. Before approving that residence, the probation officer makes a visit to the residence to ensure that it is acceptable. The Probation Department's file for each probationer lists his approved residence. Another Probation Department condition is that a probationer not change his residence without prior approval of his probation officer. In other words, before changing residences, a probationer must notify his officer, the officer must visit the proposed residence to determine if it is acceptable, and the probation officer must approve the new residence. A probationer's failure to comply with this procedure is itself a violation of the terms of his probation.

Dowling received a tip that Manuel was violating his the conditions of his probation (by residing at an unapproved residence) and also that he was violating the law (by selling drugs). Dowling corroborated this tip by going to the alleged unapproved residence and observing "T. Manuel" on the mailbox. See Gates, 462 U.S. at 241 ("Our decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work."); United States v. Tirado, 133 Fed. App'x 13, 17 (3d Cir. 2005) (unpublished) (affirming district court's denial of motion to suppress based in part on parole officer's corroboration of informant's tip). Of course, Dowling could have done more to corroborate the information, such as checking with the landlord or other property or utility records, but such extra steps were not required of him. See White, 496 U.S. at 331.

Once Dowling had this "reasonable suspicion" that Manuel was living at the unapproved residence, Dowling was constitutionally permitted to search the residence. To this end, he arranged a meeting with Manuel and obtained Manuel's set of keys.[6] Manuel

---

[6] The Pennsylvania Superior Court's concern about intrusions into others' space, see Commonwealth v. Edwards, 874 A.2d 1192, 1197-98 (Pa. Super. Ct. 2005), does not carry much weight here. Indeed, Dowling took the prudent course: he could have attempted to somehow otherwise gain access to the residence, but this had the potential to interfere with (or violate) a third party's Fourth Amendment rights (if the residence turned out not to be

further corroborated that he was residing at the W. Washington Street address when his eyes "got big" at its mention and when Dowling confirmed that Manuel possessed a set of keys in his pocket that unlocked the door to the apartment.

Defendant's reliance on Commonwealth v. Edwards, 874 A.2d 1192 (Pa. Super. Ct. 2005), is misplaced.  In Edwards, two different parole officers received tips from unreliable informants that the parolee was living in an unapproved residence and was again selling drugs.  Id. at 1193.  The officers drove by the alleged unapproved residence and observed the parolee standing outside, going inside, and then coming back outside. Id.  When the officers questioned him, he stated that the residence belonged to a friend who had given him a key and that he was there only to let a contractor in.  Id. at 1194.  The contractor, who was present, stated that the parolee had indeed unlocked the door that day.  Id.  The officers observed a pager lying just inside the front door and, because possession of a pager was a violation of the parolee's parole conditions, the officers entered the home (without the parolee's permission). Id.  Once inside, the officers observed mail in the parolee's name and with the unapproved address.  Id.  The officers then searched the residence and found narcotics.  Id.

The trial court granted the parolee's motion to suppress the

---

Manuel's).  Rather, he obtained the keys from Manuel.

10

evidence, and the appellate court affirmed.  Id. at 1195.  The court found that the officers lacked "reasonable suspicion" of criminal wrongdoing or parole violations before searching the residence without a warrant or the parolee's consent.  Id. at 1196.  The informants had not proven reliable in the past.  Id.  And the parolee provided, and the contractor vouched for, a plausible explanation of why the parolee was at the residence and possessed keys that unlocked the premises.  Id. at 1196-97.

    Here, although the informant had not proved reliable in the past, Dowling corroborated the information he provided by going to the alleged unapproved residence and observing "T. Manuel" on the mailbox.  Moreover, Manuel did not provide even a plausible explanation regarding the residence; to the contrary, when questioned about it, his eyes "got big," demonstrating, in the experienced opinion of Dowling, that Manuel was hiding something.

    This case more closely resembles the facts of Tirado, a convincing, albeit non-precedential, opinion from the Third Circuit.  In Tirado, an informant told the probation officer that he had purchased drugs from a certain individual (the defendant) at a certain address (the defendant's).  133 Fed. App'x at 14-15.  The officer corroborated the information by driving by the residence and checking the listed address for the defendant in his parole file.  Id. at 17.  The informant was reliable because he had first-hand knowledge.  Id. at 18.  Third Circuit upheld

11

the district court's finding that the probation officer had "reasonable suspicion" to search the defendant's residence.  <u>Id.</u>

After corroborating the information provided by the anonymous source, Dowling had "reasonable suspicion" to believe that Manuel was residing in an unapproved residence, and thus to search the residence.

III.  CONCLUSION

Probation Officer Dowling had "reasonable suspicion" to search the residence at 916 W. Washington Street.  Therefore, Manuel's Fourth Amendment rights were not violated.  Manuel's motion to suppress will be denied.

An appropriate Order follows.

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :
                              :    CRIMINAL ACTION
         v.                   :    NO. 07-177
                              :
TERRANCE MANUEL               :
```

**O R D E R**

**AND NOW,** this **7th** day of **September 2007,** after a suppression hearing held on July 18, 2007, for the reasons stated in accompanying Memorandum, it is hereby **ORDERED** that Defendant's motion to suppress (doc. no. 19) is **DENIED.**

**AND IT IS SO ORDERED.**

                                  _____
                                  **EDUARDO C. ROBRENO, J.**